- FOR PUBLICATION -

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| H.E.INDIVIDUALLY AND ON BEHALF OF H.F, C.E. INDIVIDUALLY AND ON BEHALF OF D.E., AND M.T. INDIVIDUALLY AND ON BEHALF OF T.T.,<br><br>              **Plaintiffs,**<br><br>     **v.**<br><br>**WALTER D. PALMER LEADERSHIP LEARNING PARTNERS CHARTER SCHOOL AND COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF EDUCATION,**<br>              **Defendants.** | CIVIL ACTION<br><br>NO.  15-3864 |

## OPINION

This dispute presents the increasingly prevalent and pressing question of who is responsible for a charter school's past failure to provide a Free Appropriate Public Education ("FAPE") to children with disabilities under the Individuals with Disabilities Education Act ("IDEA") when the charter school has closed its doors.  Plaintiffs are three children ("Students") with disabilities under the IDEA and their parents ("Parents") (collectively with Students, "Plaintiffs").  The Students were formerly enrolled at the Walter D. Palmer Leadership Learning Partners Charter School ("Palmer"), a Philadelphia charter school that is now closed and going through liquidation proceedings.  After Palmer's closure, Plaintiffs filed IDEA due process complaints with the Pennsylvania Office of Dispute Resolution ("ODR") against Palmer and the Pennsylvania Department of Education ("PDE"), alleging they had been denied a FAPE.  The Special Education Hearing Officer dismissed their complaints and Plaintiffs brought this action challenging his decisions.

The case is now before the Court on: 1) Plaintiffs' Partial Motion for Summary Judgment against Defendant PDE; 2) Defendant PDE's Motion for Summary Judgment on all claims against it; and 3) Plaintiffs' Motion for Default Judgment on all their claims against Defendant Palmer.

## I.    LEGAL UNDERPINNING

As a preliminary matter, it is helpful to briefly summarize the legal framework against which this case has unfolded.  The IDEA requires states to "make available a free and appropriate public education to all children with disabilities residing within their borders."  *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 556 (3d Cir. 2010).  Indeed, certain federal funding to State Educational Agencies[1] ("SEA's") and Local Educational Agencies[2] ("LEA's") is contingent upon states adopting and implementing plans to accomplish this.  *See* 20 U.S.C. §§ 1412, 1413.  The statutorily required "free and appropriate public education"[3] mandates instruction that is "'specially . . . designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction.'"  *D.S.*, 602 F.3d at 556 (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 188–89 (1982)).  Such instruction must "provid[e] 'significant learning' and 'meaningful benefit' to the child."  *Id.*

---

[1] "'State educational agency' means the State board of education or other agency or officer primarily responsible for the State supervision of public elementary schools and secondary schools . . . ."  20 U.S.C. § 1401(32).  PDE is Pennsylvania's State Education Agency, and it receives relevant federal financial assistance.  *See Battle v. Pennsylvania*, 629 F.2d 269, 273 (3d Cir. 1980); Stipulated Facts ("S.F.") at 2, ¶¶11–12, ECF No. 47.

[2] "'[L]ocal educational agency' means a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary schools or secondary schools in a city, county, township, school district, or other political subdivision of a State, or for such combination of school districts or counties as are recognized in a State as an administrative agency for its public elementary schools or secondary schools."  20 U.S.C. § 1401(19)(A).  Accordingly, Palmer was a LEA.  S.F. at 2, ¶¶9–10; *see also* 22 Pa. Code § 711.3.

[3] 20 U.S.C. § 1401(9)(A)–(D) ("The term 'free and appropriate public education' means special education and related services that . . . (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency [sic]; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under [20. U.S.C.] § 1414(d).").

(citing *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 247 (3d Cir. 1999)).  "The right to a FAPE ensures that students with special education needs receive the type of education that will 'prepare them for further education, employment, and independent living.'"  *Ferren C. v. Sch. Dist. of Philadelphia*, 612 F.3d 712, 717 (3d Cir. 2010) (quoting 20 U.S.C. § 1400(d)(1)(A)).  The central mechanism by which the IDEA secures the right to a FAPE in all children is the "Individualized Education Program," 20 U.S.C. §§ 1412(a)(4), 1414(d), which is "'the package of special educational and related services designed to meet the unique needs of the disabled child.'"  *Ferren C.*, 612 F.3d at 717 (quoting *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 526 (3d Cir. 1995)).

The IDEA also provides procedural safeguards to parents and students should disputes arise.  States must adopt procedures affording "[a]n opportunity for any party to present a complaint . . . with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child."  20 U.S.C. §§ 1415(a), (b)(6)(A).  "Whenever [such] a complaint has been received [the parents] shall have an opportunity for an impartial due process hearing . . . ."  20 U.S.C. § 1415(f)(1)(A).  In Pennsylvania, the Commonwealth's Office of Dispute Resolution ("ODR") is responsible for conducting IDEA due process hearings.  *See* 22 Pa. Code § 14.162.  "Any party aggrieved by the [Hearing Officer's] findings and decision . . . shall have the right to bring a civil action with respect to the [due process] complaint . . . in a State court of competent jurisdiction or in a district court of the United States . . . ."  20 U.S.C. § 1415(i)(2)(A).

Nevertheless, as a matter of policy, the IDEA contemplates and even encourages parents and educational agencies to resolve disputes without resort to contested hearings.  The IDEA provides for mandatory early resolution sessions, which must be convened within 15 days of the

filing of a due process complaint.  20 U.S.C. § 1415(f)(1)(B).  Parents also have the option of

using the IDEA's statutory mediation process.  20 U.S.C. § 1415(e).  Successful resolution and

mediation sessions culminate in written settlement agreements, signed by the parents and the

educational agency, that are "enforceable in any State court of competent jurisdiction, or in a

district court of the United States."  20 U.S.C. § 1415(f)(1)(B)(iii); 20 U.S.C. § 1415(e)(2)(F).

While the IDEA does not specifically provide for the execution or enforcement of settlement

agreements reached outside of the formal resolution or mediation process, parents and

educational agencies are free to enter into such agreements.  Unlike settlement agreements

reached through resolution or mediation, the IDEA does not provide the district courts with

subject matter jurisdiction to hear suits to directly enforce these "informal settlement

agreements."

## II.    PROCEDURAL BACKGROUND

This case arises under factual and procedural circumstances that are somewhat unusual.

While Palmer was still operating, each of the Plaintiffs entered into individual informal

settlement agreements (collectively, "Settlement Agreements") with Palmer, none of which were

reached through the IDEA resolution or mediation process.  In March of 2015, in the weeks after

Palmer shut down, Plaintiffs retained new counsel and filed IDEA due process complaints with

the Pennsylvania Office of Dispute Resolution ("ODR") against Palmer and PDE.  The

complaints alleged that students were denied a FAPE while enrolled at Palmer and sought

compensatory education and declaratory relief "in the form of an adjudication that Student[s']

rights ha[d] been violated under the IDEA, Section 504, and the ADA."  Joint Appendix of

Exhibits ("J.A.") 11, ¶¶24–25; 42, ¶¶24–25; 71, ¶24 to 72, ¶25.  M.T. and T.T. additionally

sought "reimbursement/payment for an independent educational evaluation in all areas of

suspected disability for Student." J.A. 71, ¶23. The Special Education Hearing Officer scheduled hearings in each of the cases. Palmer did not respond in any substantive way. PDE filed a motion to dismiss for lack of jurisdiction.

On April 27, 2015, the Hearing Officer dismissed the due process complaints, cancelled each of the scheduled hearings, and issued a separate written decision for each of the six ODR files. The decisions dismissing the three due process complaints against Palmer contain identical legal analysis in their "Discussion" sections. Similarly, the decisions dismissing the three due process complaints against PDE contain identical legal analysis in their "Discussion" sections. In none of the decisions did the Hearing Officer make a determination as to whether any of the Students were denied a FAPE. In the Palmer cases, he found that because of the existence of the Settlement Agreements, Plaintiffs' claims were "not a controversy . . . within the jurisdiction of special education due process, [but rather] a contractual dispute between the parent[s] and Charter School which must go through the receivership/settlement-of-claims process." J.A. 16; 47; 77. Observing that the Settlement Agreements are "binding on both parties," he concluded that "[t]he fact that [Palmer] is no longer functioning does not give the parent[s], to use playground terminology, a FAPE 'do-over.'" J.A. 15; 46; 76.

In the companion decisions regarding Plaintiffs' complaints against PDE, the Hearing Officer made two distinct decisions. First, he denied PDE's motion to dismiss for lack of jurisdiction. In reaching this conclusion, he considered provisions of the IDEA and its implementing regulations and concluded that it was "clear" that the IDEA confers ODR Special Education Hearing Officers with jurisdiction over State Educational Agencies, including PDE. J.A. 21; 52; 82. Second, he determined *sua sponte* that Plaintiffs' claims against PDE were not ripe for adjudication because they had not sought to enforce the Settlement Agreements with

Palmer through the liquidation or settlement-of-claims process first.  While he allowed for the possibility that PDE may eventually have some liability to the Students as a result of Palmer's failure to provide them with a FAPE, the Hearing Officer concluded that such a determination could not be made until the claims against Palmer arising out of the Settlement Agreements were fully adjudicated through the liquidation or settlement-of-claims process.  Accordingly, on the grounds that they were not ripe, he dismissed the claims against PDE without prejudice to re-file if and when Plaintiffs could show that they were unable to obtain complete relief in the receivership proceedings.  The Hearing Officer's decisions were made solely on the pleadings. After dismissing the complaints, he cancelled the scheduled due process hearings.

On July 10, 2015, Plaintiffs initiated the instant matter appealing the Hearing Officer's decisions pursuant to 20 U.S.C. § 1415(i)(2)(A).[4]  Their Complaint seeks to reverse the Hearing Officer's decisions and remand the cases back to ODR for due process hearings.  In moving for partial summary judgment against PDE and default judgment against Palmer, Plaintiffs ask the Court to do more than review the Hearing Officer's decisions for error: they would have the Court reach the merits of their IDEA claims, as well as their state law claims for equitable rescission of the Settlement Agreements.  Plaintiffs also seek leave to file a motion for attorneys' fees should the Court grant any of the relief sought.

For its part, PDE moves for summary judgment on all claims against it on the grounds that:  PDE did not violate or fail to comply with its obligations under the IDEA; PDE is not an LEA, nor does it assume the obligations of an LEA; ODR has no jurisdiction over PDE;

---

[4] PDE asserts that Plaintiffs only challenge the three decisions involving PDE, and not the other three decisions involving Palmer.  This assertion is factually incorrect.  Both PDE and Palmer are named defendants.  Moreover, the parties have provided the relevant portions of the administrative record from both the Palmer and PDE cases in the summary judgment record.  20 U.S.C. § 1415(i)(2)(C) ("In any action brought under this paragraph, the court—(i) shall receive the records of the administrative proceedings.").

Plaintiffs' claims are moot; Plaintiffs failed to exhaust their administrative remedies; and that

Plaintiffs are not entitled to attorneys' fees because they are not the prevailing party.  To the

extent Plaintiffs would have this Court reach the merits of their IDEA and state law claims, PDE

argues this Court lacks subject matter jurisdiction because the Hearing Officer's decisions were

not made on the merits, and so these claims are unexhausted.

## III.    THE FACTS

### A.   Walter D. Palmer Leadership Learning Partners Charter School

Palmer began operating as a charter school in Philadelphia on July 1, 2000.  After a long-

running, heavily litigated dispute involving Palmer's enrollment of students beyond its

enrollment cap and the amount of funding it was legally entitled to from the Philadelphia School

District and PDE—the details of which are only tangentially relevant to this litigation—Palmer

began to encounter financial difficulties in the fall of 2011.  The situation worsened considerably

over the next several years, such that Palmer's Board of Trustees unanimously decided to cease

operations effective December 31, 2014.  By letter dated December 26, 2014, Palmer informed

its students and their parents of the decision to close the school.  In September of 2015, Palmer

filed a petition for court supervision of voluntary dissolution in the Orphans' Court Division of

the Court of Common Pleas of Philadelphia County, Pennsylvania.

### B.   The Students

To the extent relevant to the disposition of the motions before the Court, the individual

histories of the Students and their Parents' complaints against Palmer are summarized here.

#### 1.   H.F.

H.F., who is currently 11 years old and is in the sixth grade, began attending preschool at

Palmer in September of 2008.  Plaintiffs and PDE stipulate that "[a]t times, Palmer Charter

School failed to provide H.F. with a free and appropriate public education."  Stipulated Facts ("S.F.") at 5, ¶36.

In September of 2013, H.E. (H.F.'s mother) told Palmer she planned to file a due process complaint for failure to provide her daughter with a FAPE.  In February of 2014, H.F.'s IEP team identified her as "a student with disabilities under the IDEA arising from a Specific Learning Disability and Other Health Impairment due to Attention Deficit Hyperactivity Disorder."  S.F. at 4, ¶32.  On  May 20, 2014, the parties entered into a Settlement Agreement ("H.F. Settlement Agreement") to resolve all educational claims through the date of the agreement.  The H.F. Settlement Agreement was reached informally between the parties, and not through an IDEA resolution or mediation session.  Under the terms of the H.F. Settlement Agreement, Palmer agreed to provide H.F. with 600 hours of compensatory education at a cost not to exceed $60.00 per hour which yields a total value of $36,000.  In exchange, H.E. and H.F. released all claims against Palmer and its successors that could have been asserted in an IDEA due process hearing.  Palmer further agreed to provide $8,000 in attorneys' fees to H.F.'s settlement attorney.  No provision was made as to an alternate placement for H.F.  In October of 2014, H.F. was identified as having Emotional Disturbance.  On or about October 20, 2014, Palmer placed H.F. at the Delta School, an Approved Private School, through a Notice of Recommended Educational Placement.  H.F. currently attends a third school.

Notwithstanding the terms of the H.F. Settlement Agreement, Palmer never provided H.F. with any compensatory education.[5]  Plaintiffs' counsel indicates that H.F.'s settlement attorney received payment but not how much.  Plaintiffs and PDE allow for the possibility that H.F.'s settlement attorney may have submitted a claim in the Palmer dissolution proceedings, but there is nothing in the record that would show whether this claim is related to the H.F. Settlement Agreement.

After the Hearing Officer issued his decisions, PDE's Bureau of Special Education initiated its own investigation into the Students' education and determined that Palmer had denied them a FAPE.  Accordingly, PDE concluded that from the period starting March 17, 2013 and ending October 14, 2014, H.F. was owed 2,025 hours of compensatory education but did not attached a dollar value to those hours.

### 2.  D.E.

D.E., who is currently 11 years old and in the sixth grade, began attending Palmer as a second grader in September of 2012.  When he enrolled at Palmer, he had already been "identified as a student with Emotional Disturbance and a Specific Learning Disability."  J.A. 132, ¶6.  Plaintiffs and PDE stipulate that "[a]t times, Palmer Charter School failed to provide D.E. with FAPE."  S.F. at 9, ¶82.

On approximately June 13, 2014, C.E. (D.E.'s mother) told Palmer she planned to file a due process complaint for failure to provide her son with a FAPE.  On October 20, 2014, the

---

[5] In responding to Plaintiff's motion for summary judgment, PDE contends that "the stipulations and exhibits do not support a conclusion that [Students] did not receive any compensatory education . . ." from Palmer, but only that "'according to' the parents Students did not receive any compensatory education."   Because PDE points to no evidence in the summary judgment record that would contradict the Parents' affidavits and the affidavit of M.T.'s and C.E.'s settlement attorney, there is no genuine dispute as to this material fact.  *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 266 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)) ("[A] party will not be able to withstand a motion for summary judgment merely by making allegations; rather, the party opposing the motion must go beyond its pleading and designate specific facts by use of affidavits, depositions, admissions, or answers to interrogatories showing there is a genuine issue for trial.").

parties entered into a Settlement Agreement ("D.E. Settlement Agreement") to resolve all educational claims through the date of the agreement.  The D.E. Settlement Agreement was reached informally between the parties, and not through an IDEA resolution or mediation session.  The D.E. Settlement Agreement provided that there was agreement between the parties that D.E. was "in need of an Approved Private School placement," that D.E. would be enrolled in the Delta School during the summer of 2014 for "Extended School Year programming," and that "referrals w[ould] be made for [D.E.] to continue attending an [Approved Private School]" the following academic year.  J.A. 31, ¶1.  Furthermore, D.E. would be "entitled to a total of 900 hours of compensatory education, with a total value of $54,000 (900 hours at $60.00 per hour)." JA 31, ¶3.  Half of the value of the compensatory education hours, $27,000, was to be held in an Educational Trust Fund that was to be funded in three installments of $9,000 each to be made by Palmer on October 1, 2014, December 1, 2014, and February 1, 2015.  Palmer further agreed to provide $3,000 in attorneys' fees to D.E.'s settlement attorney.  In exchange, C.E. and D.E. released all claims against Palmer and its successors that could have been asserted in an IDEA due process hearing.  D.E. currently attends the Delta School.

Notwithstanding the terms of the D.E. Settlement Agreement, Palmer never provided D.E. with any compensatory education, and never made the required payments into the special needs trust fund.  Neither did Palmer pay D.E.'s settlement attorney the fees called for by the D.E. Settlement Agreement.  PDE subsequently determined that from the period starting March 17, 2013 and ending June 19, 2014, D.E. was owed 1,832.1 hours of compensatory education but did not attached a dollar value to those hours.

### 3. *T.T.*

T.T., who is currently 8 years old and in the third grade, began attending Palmer as a kindergartener in September of 2013.  When he enrolled at Palmer, T.T. had already been identified as a student with disabilities under the IDEA.  J.A. 128, ¶6, S.F. at 13, ¶127.  Plaintiffs and PDE stipulate that "[a]t times, Palmer Charter School failed to provide T.T. with FAPE." S.F. at 14, ¶130.

After M.T. (T.T.'s mother) told the school in November of 2013 of her intention to file a due process complaint for failure to provide her son with a FAPE, the parties entered into a Settlement Agreement ("T.T. Settlement Agreement") on June 9, 2014, resolving all educational claims through the date of the agreement.  The T.T. Settlement Agreement was reached informally between the parties, and not through an IDEA resolution or mediation session.  The T.T. Settlement Agreement set a timeline to transfer T.T. into "an Approved Private School placement," which all agreed was necessary.  J.A. 62, ¶1.  Additionally, T.T. was entitled to "a total of $13,000 worth of compensatory education."  J.A. 62, ¶4.  Unlike the H.F. and D.E. Settlement Agreement, the T.T. Settlement Agreement is silent as to the number of hours of compensatory education owed.  Palmer agreed to reevaluate T.T. "within three months of the date of the execution of th[e] Settlement Agreement," J.A. 62, ¶3, to provide $8,500 in attorneys' fees to T.T.'s settlement attorney and also to reimburse M.T. for travel expenses in the amount of $500.  In exchange, M.T. and T.T. released all claims against Palmer and its successors that could have been asserted in an IDEA due process hearing prior to the T.T. Settlement Agreement.  M.T. has since removed T.T. from the Delta School and placed him in another private school.

Notwithstanding the terms of the T.T. Settlement Agreement, Palmer never provided T.T. with any compensatory education and did not reevaluate T.T. as called for by the agreement. Plaintiffs' counsel concedes that Palmer did pay M.T. the $500 reimbursement of her travel expenses. However, there is nothing to indicate that Palmer paid M.T.'s settlement attorney the fees owed under the T.T. Settlement Agreement. PDE subsequently determined that from the period starting September 16, 2013 and ending April 30, 2014, T.T. was owed 606.3 hours of compensatory education but did not attached a dollar value to those hours.

IV.    DISCUSSION

Two initial questions are presented in deciding the motions. These are first, whether the Hearing Officer had jurisdiction to adjudicate the FAPE denial claims, and second, whether the claims against PDE were ripe for adjudication. Because, as set forth below, both questions are answered affirmatively, the case will be remanded to the Special Education Hearing Officer for a determination in the first instance: 1) whether Palmer denied Students a FAPE; and 2) if so, what remedy they are owed by PDE. As such, the Court declines to reach Plaintiffs' IDEA and state law claims for relief, and denies PDE's Motion for Summary Judgment.[6]

A.    **Review of the Special Education Hearing Officer's decisions**

1.    *Standard of review and burden of proof*

In the decisions below, the Special Education Hearing Officer did not conduct an IDEA due process hearing, but instead rested his decisions wholly on the pleadings. More specifically, he did not make any finding as to whether Students were denied a FAPE. Had the Hearing

---

[6] On July 21, 2016, in its Motion for Summary Judgment, PDE raises the argument for the first time that judgment should be granted in its favor because PDE was not subject to the Special Education Hearing Officer's jurisdiction. This argument is, however, untimely, because it was not made within the 90-day limit allowed to challenge a Hearing Officer's decision. 20 U.S.C. § 1415(i)(2)(B). The defense is also waived because it was not asserted in PDE's Motion to Dismiss or its Answer.

Officer done so, those factual determinations would have been entitled to due weight and

deference. *Bayonne Bd. of Educ.*, 602 F.3d at 564 (quoting *P.P. ex rel. Michael P. v. W. Chester*

*Area Sch. Dist.*, 585 F.3d 727, 734 (3d Cir. 2009)) ("[A] district court must give 'due weight'

and deference to the findings in the administrative proceedings.").  Instead, the Court reviews the

Hearing Officer's decisions *de novo*, as they are conclusions of law that would not be aided by

the Special Education Hearing Officer's administrative expertise.  *See Blunt v. Lower Merion*

*Sch. Dist.*, 767 F.3d 247, 266 (3d Cir. 2014), *cert. denied sub nom.*, *Allston v. Lower Merion Sch.*

*Dist.*, 135 S. Ct. 1738 (2015); *P.P. ex rel. Michael P.*, 585 F.3d at 735 (hearing officer's

conclusions of law "are subject to plenary review.").  The burden of persuasion is on the party

challenging the hearing officer's decision.  *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 270 (3d Cir.

2012) (citations omitted).

### 2.  *The Hearing Officer's dismissal of complaints against Palmer for lack of jurisdiction*

Turning to the question of whether it was proper for the Hearing Officer to dismiss the

complaints against Palmer for lack of jurisdiction and decline to adjudicate the FAPE denial

claims, the Court's analysis is informed by what the Plaintiffs asked the Hearing Officer to do

and how he interpreted what they asked him to do.  Plaintiffs' due process complaints assert that

"Student[s] [were] denied [a] FAPE at Charter School."  J.A. 10, ¶16; 41, ¶16; 70, ¶15.  This

general assertion is elaborated in greater specificity with regard to each of the Students in the

"Violations" section of each of the due process complaints.  Although Plaintiffs' due process

complaints asserted that Palmer had breached the Settlement Agreements, thereby rendering

them voidable, they never asked the Hearing Officer to grant rescission, or to order Defendants

to comply with the Settlement Agreements.[7]   They only relief they sought from the Hearing

Officer was a decision on whether they had been denied a FAPE and what compensatory

education was owed—they did not ask him to rescind or enforce the Settlement Agreements.

Nevertheless, in framing the issues before him, the Hearing Officer conflated the FAPE

denial claims that had been asserted in the due process complaints, and grievances about the

Settlement Agreements, which had not:

> Parent[s] claim[] the Charter School has not met the FAPE-related
> obligations it undertook in the [Settlement Agreements] and that this lack
> of performance, and the current non-operational status of the Charter
> School, voids the [Settlement Agreements].  Parent[s] further allege[] that
> under these circumstances PDE, as the state educational agency under the
> terms of the IDEIA, bears the obligation to provide [a] FAPE to the
> [Students].

J.A. 14, ¶5; 19, ¶6; 45, ¶5; 50, ¶6; 75, ¶5; 80, ¶6.  Paraphrased in this way, Plaintiffs' complaints

would seem to be a request that the Special Education Hearing Officer enforce the terms of the

Settlement Agreements—but as has been seen, enforcement of the Settlement Agreements is not

what Plaintiffs sought.  Instead, they asserted that they had been denied a FAPE, and sought

adjudication of that assertion.

This mistaken reading of Plaintiffs' complaints led the Hearing Officer down the wrong

path.  Rather than rendering a decision "on substantive grounds based on a determination of

whether the child received a free appropriate public education," 20 U.S.C. § 1415(f)(3)(E)(i), he

found that "Parent[s'] claim[s] . . . against the Charter School [are] not [] controvers[ies] within

the jurisdiction of special education due process[, but rather] . . . contractual dispute[s] . . . which

must go through the receivership/settlement-of-claims process."  J.A. 15–16; 46–47; 76–77.

While this is a correct statement of the law—Hearing Officers do lack jurisdiction to enforce

---

[7] Indeed, it was not until Plaintiff's Motion for Default Judgment against Palmer in this case that Plaintiffs sought
equitable rescission as a remedy for Palmer's alleged breach of the Settlement Agreements.

settlement agreements—[8] the decisions nonetheless fail in the application because the Hearing

Officer in fact enforced the Settlement Agreements' release provisions *against* Plaintiffs by

concluding that: "The fact that the Charter School is no longer functioning does not give parent,

to use playground terminology, a FAPE 'do-over.' The agreement has been made and is binding

on both parties."[9]  J.A. 15; 22; 46; 53; 76; 83.

Accordingly, the Hearing Officer erred as a matter of law by failing to render a

substantive decision on Plaintiffs' FAPE denial claims, and by, in effect, enforcing the

Settlement Agreements against Plaintiffs.

### 3. *The Hearing Officer's dismissal of complaints against PDE for lack of ripeness*

Next, the Court addresses whether the Hearing Officer erred as a matter of law in making

the *sua sponte* determination that Plaintiffs' claims against PDE were not ripe for adjudication

because Plaintiffs had not yet been denied payment in Palmer's liquidation proceedings.  Given

the determination that the Hearing Officer should have adjudicated the due process claims and

acted beyond his jurisdiction in requiring the Plaintiffs to seek relief first in Palmer's liquidation

proceedings, the question devolves to whether PDE can be held liable for Palmer's FAPE

violations.  In dismissing Plaintiffs' claims against PDE without prejudice, the Hearing Officer

explicitly reserved decision on the question of whether PDE might be liable for Palmer's FAPE

violations.  His decision cites an in-depth and well-reasoned recent opinion of this Court,

*Charlene R. v. Solomon Charter School*, 63 F. Supp. 3d 510 (E.D. Pa. 2014), which held that if a

---

[8] *H.C. v. Colton–Pierrepont Central Sch. Dist.*, 341 Fed. App'x 687, 689 (2d Cir. 2009); *see also J.K. v. Council Rock Sch. Dist.*, 833 F. Supp. 2d 436 (E.D. Pa. 2011) (adopting the Second Circuit's reasoning in *H.C.* with regard to settlement agreement reached during IDEA resolution session).

[9] Because the Court declines to reach Plaintiffs' merits arguments, it does not address today whether PDE, a non-party, has enforceable rights in the Settlement Agreements.  On remand, the Hearing Officer should not reach the question either, because doing so would require exercising jurisdiction over the Settlement Agreements—jurisdiction the Hearing Officer does not have.

parent-plaintiff seeking to enforce an IDEA settlement agreement reached during a resolution meeting with a charter school could establish that the charter was now insolvent and that there was no other way to satisfy their IDEA claims, the parent could enforce the terms of the settlement agreement against PDE. *Id.* at 518–19.

A review of the summary judgment record reveals that there is no dispute that Palmer is insolvent, and Plaintiffs have virtually no chance of receiving compensatory education through Palmer's receivership process. Plaintiffs and PDE have stipulated that Palmer "permanently closed" on December 31, 2014. S.F. at 3, ¶17. Palmer's petition for court supervision of voluntary dissolution was filed in the Orphans' Court Division of the Court of Common Pleas of Philadelphia County, Pennsylvania on September 1, 2015. At the time of filing, Palmer owed $9,894,469.64 in principal and accrued interest to its bondholders, its only secured creditors. Palmer had insufficient funds to cover the secured claims of its bondholders, "even after disposing of all personal property [of Charter School] and monetizing all other assets and streams of income due [to Charter School] . . . the Bondholders . . . w[ould] be left with a substantial loss." J.A. 105, ¶42; S.F. at 3, ¶24. "[T]here w[ould] little, if any, money available to address the claims of [Palmer's] remaining [unsecured] creditors." J.A. 106, ¶45; *see also* S.F. at 4, ¶25. Palmer's unsecured creditors include the three students and their families who are Plaintiffs in this litigation, as well as PDE, who seeks indemnification for those claims. They also include entities owed substantially more, namely, the School District of Philadelphia, which is seeking $15,936,994.26, former employees seeking $500,000 in unpaid wages and overtime, as well as various vendors and suppliers, some of whom have secured judgments in amounts not disclosed against Palmer. Plaintiffs and PDE further indicate that they "are unaware of insurance coverage available to cover any liabilities" to Plaintiffs' claims. S.F. at 4, ¶26.

16

Furthermore, Plaintiffs aver, and PDE points to nothing contradictory in the record, that Palmer never provided the Students with any compensatory education, nor did it fund D.E.'s educational trust fund, nor did it reevaluate T.T. despite its clear obligations under the Settlement Agreements.  Similarly, the attorney who represented C.E. and M.T. in negotiating their settlement agreements, avers in his affidavit that: 1) Palmer owes C.E. and D.E. $54,000 in compensatory education, and him $3,000 in attorney fees, none of which has been paid through the liquidation process; and, 2) Palmer owes M.T. and T.T. $13,000  in compensatory education, and him $8,500 in attorney fees, none of which has been paid through the liquidation process. H.E.'s declaration does not indicate whether she received payment through the liquidation process, but the parties stipulate that she states that she did not and there is nothing in the record that would suggest otherwise.  Moreover, although the Court expresses no opinion on the question, the parties have stipulated that "[a]t times, Palmer Charter School failed to provide [Students] with a free and appropriate public education." S.F. at 5, ¶36; 9, ¶82; 14, ¶130. Requiring Plaintiffs to wade into Palmer's receivership process to seek recompense would be an exercise in futility for these Plaintiffs and, so, they will not be required to do so.

In light of these undisputed facts, resolving the legal question of the ripeness of Plaintiffs' claims against PDE suggests a closer analysis of the *Charlene R.* decision is warranted.  *Charlene R.* was before the Court on the defendant's (PDE's) motion to dismiss. There, the parent had entered into a settlement agreement to resolve IDEA claims against a charter school that ceased operations a mere two weeks after the agreements were executed.  63 F. Supp. 3d at 512.  Because the settlement agreement—unlike those at issue here—was reached during the formal IDEA resolution process provided for by 20 U.S.C. § 1415(f)(1)(B), parents then sought to enforce that agreement against the charter school by commencing a civil action in

the district court pursuant to 20 U.S.C. § 1415(f)(1)(B)(iii)(II).  PDE was subsequently joined as

a defendant, and Plaintiffs asserted that the contractual obligations of the now-defunct charter

school under the settlement agreement flowed to PDE.  63 F. Supp. 3d at 512.

   The *Charlene R* court examined the extent to which SEA's retain liability under the

IDEA to provide a FAPE where LEA's fall short.  Finding no binding precedent directly

addressing the question, it considered *Kruelle v. New Castle County School District*, 642 F.2d

687 (3d Cir. 1981), in which the Third Circuit held that in passing the IDEA, Congress

"'considered the establishment of a single agency on which to focus responsibility for assuring

the right to education of all handicapped children to be of paramount importance.'" 63 F. Supp.

3d at 514 (quoting *Kruelle*, 642 F.2d at 696).  The *Kruelle* Court found persuasive the following

language from the Senate Report on the IDEA:

> Without this requirement, there is an abdication of responsibility for the education
> of handicapped children. Presently, in many States, responsibility is divided,
> depending upon the age of the handicapped child, sources of funding, and type of
> services delivered.  While the committee understands that different agencies may,
> in fact, deliver services, the responsibility must remain in a central agency
> overseeing the education of handicapped children, so that failure to deliver
> services or the violation of the rights of handicapped children is squarely the
> responsibility of one agency.

*Kruelle*, 642 F.2d at 696 (quoting S. Rep. No.168, 94th Cong., 1st Sess. 24 reprinted in (1975)

U.S. Code Cong. & Ad. News 1425, 1448).  This Court agrees with *Charlene R.*'s reasoning that

although the *Kruelle* decision "did not directly address whether the state would be responsible

for remedying past [LEA] failures . . . [it] very clearly stated that the SEA retains primary

responsibility to ensure that all children with disabilities receive the education that is their right

under the IDEA."  63 F. Supp. 3d at 514.[10]

Although the Supreme Court has not directly addressed the issue of "[SEA] liability stemming from the failure of a LEA to provide a FAPE," *id.* at 515, several circuits have reached the same conclusion as *Kruelle* regarding "SEA liability for private school tuition reimbursement incurred by parents who remove children not receiving a FAPE from a LEA, and subsequently place the child in a private school."  *Id.*  (citing *Gadsby v. Grasmick*, 109 F.3d 940, 943, 952 (4th Cir. 1997) ("This language suggests that, ultimately, it is the SEA's responsibility to ensure that each child within its jurisdiction is provided a free appropriate public education.  Therefore, it seems clear that an SEA may be held responsible if it fails to comply with its duty to assure that IDEA's substantive requirements are implemented."); *St. Tammany Parish Sch. Bd. v. State of Louisiana*, 142 F.3d 776, 784 (5th Cir. 1998) (quoting *Gadsby*); *Pachl v. Seagren*, 453 F.3d 1064, 1070 (8th Cir. 2006) (citing *Gadsby*).  Reasoning from these cases, as well as the structure of 20 U.S.C. § 1412(a)(11)(A)[11] and 20 U.S.C. § 1413(g)(1),[12] The *Charlene R.* Court concluded, as does this Court, that:

---

[10] The *Kruelle* Court roundly rejected the argument made by PDE here that its responsibilities under the IDEA are supervisory only, unlike the LEA's responsibilities which are to directly provide services in the first instance.  642 F.2d at 697 ("[T]he state, in contending that it functions solely as a supervisory agency and should not be responsible for coordinating efforts to develop an IEP . . . or to insure funding, distorts the import of the district court's directive. *The argument* both mischaracterizes the nature of the accountability that the trial judge ascribed to the State Educational Agency and *is contradicted by federal . . . statutes* . . . .") (emphasis added).

[11] "The State educational agency is responsible for ensuring that-- (i) the requirements of this subchapter are met; (ii) all educational programs for children with disabilities in the State, including all such programs administered by any other State agency or local agency-- (I) are under the general supervision of individuals in the State who are responsible for educational programs for children with disabilities; and (II) meet the educational standards of the State educational agency . . . ." 20 U.S.C. § 1412(a)(11)(A).

[12] "A State educational agency shall use the payments that would otherwise have been available to a local educational agency or to a State agency to provide special education and related services directly to children with disabilities residing in the area served by that local educational agency, or for whom that State agency is responsible, if the State educational agency determines that the local educational agency or State agency, as the case may be--(A) has not provided the information needed to establish the eligibility of such local educational agency or State agency under this section; (B) is unable to establish and maintain programs of free appropriate public education that meet the requirements of subsection (a) . . . ." 20 U.S.C. § 1413(g)(1).

> Sections 1412(a)(11)(A) and 1413(g)(1), when combined with the congressional intent as discerned by *Kruelle,* clearly signal that the SEA is to bear primary responsibility for ensuring that every child receives the FAPE that he or she is entitled to under the IDEA. While the SEA ordinarily delegates actual provision of this education to LEAs, the SEA by statute must step in where a LEA cannot or will not provide a child with a FAPE.

*Charlene R.*, 63 F. Supp. 3d at 516.  Thus, where the LEA has ceased to exist, a parent may look to the SEA to vindicate their child's right to FAPE.

There is no genuine dispute as to the fact that Palmer is insolvent, has ceased to exist, is in court supervised dissolution, and has insufficient assets to provide a FAPE or compensatory education to Plaintiffs.  Therefore, the only entity that Parents can look to for vindication of their children's rights to a FAPE is PDE, and so the case against PDE is ripe for adjudication now.

### B.   Plaintiffs' Merits Claims and Motion for Default Judgment

Beyond asking the Court to determine whether the Hearing Officer erred, Plaintiffs seek the entry of summary judgment with regard to what they assert is PDE's undisputed liability to provide each of the students with a specified number of compensatory education hours reflecting Palmer's failure to provide a FAPE to the students prior to the execution of the Settlement Agreements and following the execution of the Settlement Agreements.  Citing Palmer's failure to respond to the instant litigation or to the administrative proceedings below, Plaintiffs move separately for the entry of default judgment against Palmer.  As a remedy, Plaintiffs seek the equitable rescission of the Settlement Agreements.  For its part, PDE objects that because these claims were not fully litigated in front of the Hearing Officer, Plaintiffs have not exhausted their administrative remedies, and so this Court lacks subject matter jurisdiction over the merits of their IDEA claims and state law claims for equitable rescission.

Because the Hearing Officer dismissed the due process complaints on procedural grounds, there is no substantive decision on the merits for the Court to review.  Accordingly, the Court declines to reach the merits of Plaintiffs' IDEA and state law claims.

### C.   PDE's Motion for Summary Judgment

PDE's claims for summary judgment can be dealt with briefly.  PDE's arguments that summary judgment should be granted in its favor because it is not responsible for an LEA's IDEA obligations and because Plaintiff has not demonstrated that PDE violated or failed to comply with its IDEA obligations are unavailing given the Court's holding that PDE retains ultimate responsibility to ensure that a child's right to a FAPE is secured where a charter school cannot or will not fulfill that obligation.  Further, while PDE's contention that Plaintiffs' claims are moot because it has expressed a willingness to provide compensatory education to Plaintiffs is a reason to hope for a settlement of this matter, it is not a reason to grant summary judgment in PDE's favor.  Finally, PDE's argument that Plaintiffs failed to exhaust their administrative remedies by not enforcing their claims in Palmer's dissolution proceedings was addressed by the Court in its March 28, 2016 Order on PDE's Motion to Dismiss, ECF No. 39, which remains applicable.[13]

An appropriate order follows.

**Dated**:  October 27, 2016                                    **BY THE COURT:**

                                                                **/S/WENDY BEETLESTONE, J.**

                                                                **WENDY BEETLESTONE, J.**

---

[13] The question of whether plaintiff is a "prevailing party" entitled to attorneys' fees remains open in light of the Court's decision.  Accordingly, PDE's motion for summary judgment on whether Plaintiffs are entitled to attorneys' fees shall be denied and Plaintiffs' motion for leave to file a motion for attorneys' fees is granted.  Plaintiffs' Motion for Default Judgment shall be denied without prejudice.